Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
samuel@briansking.com

Attorneys for Plaintiffs

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| C.W., individually and on behalf of A.W. a minor,<br><br>       Plaintiffs,<br><br>vs.<br><br>UNITED HEALTHCARE INSURANCE COMPANY, UNITED BEHAVIORAL HEALTH, and the COLUMBIA UNIVERSITY in the CITY of NEW YORK GROUP BENEFITS PLAN,<br><br>       Defendants. | COMPLAINT<br><br>Case No. 1:21-cv-00140 - DAO |

Plaintiffs C.W. and A.W., through their undersigned counsel, complain and allege against

Defendants United Healthcare Insurance Company, United Behavioral Health (Collectively

"United") and the Columbia University in the City of New York Group Benefits Plan ("the

Plan") as follows:

//

//

1

## **PARTIES, JURISDICTION AND VENUE**

1. C.W. and A.W. are natural persons residing in Bronx County, New York. C.W. is A.W.'s father.

2. United is an insurance company headquartered in Hennepin County, Minnesota and was the third-party claims administrator, as well as the fiduciary under ERISA for the Plan during the treatment at issue in this case.

3. The Plan is a self-funded employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). C.W. was a participant in the Plan and A.W. was a beneficiary of the Plan at all relevant times. C.W. and A.W. continue to be participants and beneficiaries of the Plan.

4. A.W. received medical care and treatment at Elements Wilderness Program ("Elements") from June 25, 2019, to August 28, 2019, and Waypoint Academy ("Waypoint") from August 29, 2019 to June 4, 2020. These are licensed treatment facilities located in Emery County, Utah and Weber County, Utah respectively, which provide sub-acute inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems.

5. United, denied claims for payment of A.W.'s medical expenses in connection with his treatment at Elements and Waypoint, as well as A.W.'s transportation to Elements.

6. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

7. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, because United does business in Utah, has a significant claims processing office in Utah, and the treatment at

issue took place in Utah. In addition, venue in Utah will save the Plaintiffs costs in litigating this case. Finally, in light of the sensitive nature of the medical treatment at issue, it is the Plaintiffs' desire that the case be resolved in the State of Utah where it is more likely their privacy will be preserved.

8. The remedies the Plaintiffs seek under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

### A.W.'s Developmental History and Medical Background

9. From a young age A.W. struggled with a number of symptoms related to hypersensitivity, sleeping, self-regulation, behavioral problems, and motor delays.

10. A.W. had his first psychological evaluation around the time that he was four years old and received an individualized education program once he started school.

11. Around the time that he was nine, A.W. began exhibiting symptoms of severe obsessive-compulsive disorder.

12. He started seeing a psychologist which helped these symptoms initially but did not lead to lasting gains.

13. A.W. was bullied at school and began to experience severe depression, panic attacks, and anxiety. A.W. started refusing to go to school and would often isolate himself in his room.

14. A.W. continued to meet with mental health professionals and was prescribed various medications but he reacted very poorly to them and experienced severe side effects such as suicidal ideation and paranoid delusions.

15. A.W. started attending a private school with individualized instruction but due to his previous negative experiences with school he was deeply mistrustful and frequently continued to refuse to attend.

16. A.W. compulsively washed his hands at extremely frequent intervals, at times every seven or eight minutes, and was extremely concerned about germs and bacteriological contamination of his surroundings.

17. In April of 2018, following a particularly severe panic attack coupled with paranoid delusions, A.W. was rushed to a psychiatric hospital and given a neuropsychological evaluation.

18. This evaluation stated that A.W. did not have the coping skills required to deal with his anxiety and obsessive behavior and these were causing significant problems in his daily life.

19. A.W. continued to have frequent debilitating panic attacks and continued to refuse to attend school, he started attending a day treatment program but it was ineffective.

**Elements**

20. A.W. was admitted to Elements on June 25, 2019, via Assisted Interventions, a crisis transportation service.

21. In a series of Explanation of Benefits ("EOB") statements, United denied payment for A.W.'s treatment and transportation.

22. United denied the transportation on the grounds that additional information was required and denied payment at Elements under the justification that it was not a covered service.

23. On April 10, 2020, C.W. appealed the denial of payment for A.W.'s treatment and transportation. He asked United to comply with its obligations under ERISA and to provide him with the full, fair, and thorough review to which he was entitled.

24. He stated that United had not specified which information was allegedly missing, inhibiting him from knowing why A.W.'s transportation was not covered.

25. He argued that he had already furnished the information necessary, but he could obviously not be aware of what information United considered to be missing if it failed to disclose this. C.W. listed the documentation he had provided and asked United to specify what exactly was missing.

26. C.W. argued that the treatment A.W. received at Elements was a covered benefit under the Plan and met the definition of an Alternate Facility as defined in the insurance policy. He wrote that apart from informing him that the treatment had been denied, United had provided essentially zero information to support its decision.

27. He contended that Elements was a licensed behavioral health facility and met the stringent requirements set forth by the State of Utah to maintain this licensure.

28. C.W. in addition stated that Elements was nationally accredited and recognized.

29. C.W. asserted that United's denial likely violated MHPAEA. He reminded United that it was required to administer benefits "at parity" between mental health services and their medical or surgical analogues.

30. C.W. identified skilled nursing and inpatient rehabilitation as some of the medical or surgical counterparts to Elements. C.W. stated that United also covered non-emergency

transportation in the medical/surgical realm, so its denial of A.W.'s mental health transport also likely violated MHPAEA.

31. C.W. requested that United perform a MHPAEA compliance analysis and to provide him with physical copies of the results of this analysis.

32. C.W. asked in the event the denial was upheld that he be provided with the specific reasoning for the denial along with any corresponding evidence, a copy of any administrative service agreements that existed, any clinical guidelines or medical necessity criteria used to evaluate the claim, the Plan's mental health, medical necessity, skilled nursing, inpatient rehabilitation, and hospice criteria, and any reports from any physician or other professional involved with the claim. (collectively the "Plan Documents")

33. In letters dated May 12, 2020, United maintained the denial of payment for A.W.'s transportation and treatment at Elements.

34. United denied payment for the transportation on the grounds that it was not a covered service and did not meet the summary plan description's criteria for non-emergency transportation.

35. United denied the treatment at Elements under the justification that:

> Your child was being treated for mood problems.
>
> Your request was reviewed. We have denied the medical services requested. We reviewed your child's records. The criteria were not met because: Your child was in a wilderness therapy program. There is not enough proof that wilderness therapy is safe and effective for treating mental health problems.

36. On June 18, 2020, C.W. submitted a level two appeal of the denial of A.W.'s treatment at Elements and his transportation there.

6

37. He contended that United continued to disregard its obligations under ERISA and had not provided him with any of the documents he requested or even addressed the arguments he had raised, including his assertion that United violated MHPAEA.

38. He wrote that United was avoiding its fiduciary duty and expressed concern that this was not an inadvertent error but was an intentional attempt to safeguard United's financial self-interest at his own expense. He reminded United that it had an obligation to act in his best interest.

39. He contended that Elements did not provide experimental or investigational services but was a licensed and accredited facility which clearly met the Plan's definition of an "alternate facility."

40. He wrote that United had ignored his arguments and relied on proprietary criteria to deny payment. He pointed out that these same criteria clearly stated that in the event of a conflict between the criteria and the terms and conditions of the Plan, the Plan language always took precedence.

41. He argued that because the Plan language clearly outlined that coverage was available, payment should not have been denied based on criteria which were not applicable.

42. He quoted the "Experimental or Investigational Services" portion of the summary plan description and stated that there was nothing in this section which would or could apply to the treatment A.W. received at Elements.

43. He further questioned how a treatment program could be considered "experimental" when it was duly licensed by a state regulatory agency.

44. He contended that the treatment provided at Elements was proven and effective and attached a variety of peer-reviewed research articles to demonstrate this fact.

45. He argued that United had improperly classified Elements in the same category as a summer or scout camp which were intended solely for recreation and had no therapeutic value.

46. C.W. continued to allege that United's denial of A.W.'s transportation to, and treatment at, Elements violated MHPAEA. He contended that United was imposing a restriction based on facility type and provider specialty which it did not equally apply to medical or surgical services.

47. He quoted the decision in *Johnathan Z. v Oxford Health Plans* in which the court had found that United subsidiary Oxford Health's prohibition on wilderness treatment through the use of an "experimental" exclusion and its categorical exclusion of these services in general raised sufficient concerns regarding an exclusion based on geographic location, facility type, or provider specialty, that the plaintiffs in that case could plausibly plead a violation of MHPAEA.

48. C.W. again asked United to perform a parity analysis and once more requested to be provided with a copy of the Plan Documents. He asked that in the event United was not acting on behalf of the Plan Administrator in this capacity or for whatever reason did not possess these documents that it forward his request to the appropriate entity.

49. In a letter dated July 13, 2020, United upheld the denial of payment for A.W.'s treatment. The letter gave the following justification for the denial:

> Taking into consideration the available information, along with the locally available clinical services, it is my determination that the requested service did not meet the Optum Behavioral Clinical Policy required to be followed in the member's behavioral health plan benefits. Specifically, the facility has billed for revenue code 1006, which is applicable to Behavioral Health Accommodations; Outdoor/Wilderness Behavioral Health Care and appropriate for the treatment the member received. However, there is inadequate evidence of the safety and efficacy of wilderness therapy for treating mental health conditions including but

not limited to Adjustment Disorders, Mood Disorders, Anxiety Disorders, Conduct Disorders, Impulse Disorders, Social Functioning Disorders, or Substance Related Disorders. The requested treatment is not medically necessary.

**Waypoint**

50. A.W. was admitted to Waypoint on August 29, 2019.

51. In a letter dated September 3, 2019, United denied payment for A.W.'s treatment at Waypoint. The letter offered the following justification for the denial:

> Based on the Optum Level of Care Guideline for the Mental Health Residential Treatment Center Level of Care, it is my determination that no authorization can be provided from 08/29/2019 forward.
>
> Your child was admitted for treatment of a Mood Disorder.
>
> After reviewing the available information, it is noted your child that your child's [sic] condition does not meet guidelines for coverage of treatment in this setting.
>
> - Your child is medically stable.
> - Your child is not at risk of severe withdrawals
> - Your child is not having thoughts of harming himself or others.
> - Your child does not hear things or see things that others don't
> - Your child does not have severe mental health issues that keep your child from having treatment in a less intensive setting.
> - Your child has family support.
>
> Instead, your child's care and recovery could be provided care [sic] in the Mental Health Partial Hospitalization Program setting. Your child can receive treatment for 20 or more hours weekly in the program.

52. On February 20, 2020, C.W. submitted a level one appeal of the denial of payment for A.W.'s treatment.

53. C.W. wrote that he was entitled to certain protections under ERISA, and United had an obligation to fully review all of the information he provided, to utilize appropriately qualified reviewers and disclose their identities, to give a justification for the denial that was specific and clear, to provide him with the information necessary to perfect the claim, and to act in his best interest.

54. C.W. wrote that he had contacted United and asked for a copy of the case notes and had been provided with these in a letter dated September 3, 2019.

55. The case notes denied payment due to a supposed lack of medical necessity and because A.W. "is not noted to be a danger to self/others."

56. C.W. stated that because the denial dealt solely with medical necessity and did not raise any concerns about Waypoint, he was writing his appeal under the assumption that United considered Waypoint to be a covered facility and the sole basis for the denial was an alleged lack of medical necessity.

57. C.W. expressed concern that United had relied on criteria and guidelines which violated generally accepted standards of medical practice.

58. C.W. referenced the Court decision in *Wit et.al., v United Behavioral Health* in which United's guidelines were found to violate generally accepted standards of care on multiple counts, including relying on acute criteria for a subacute level of care, and pushing individuals into a lower level of care regardless of whether this was effective or appropriate.

59. C.W. argued that while the *Wit* decision referenced an earlier version of United's guidelines, it was clear from the plain language of its denial letters that United persisted in violating generally accepted standards of medical practice and continued engaging in behaviors which the court had specifically identified as problematic in *Wit*.

60. C.W. stated that this was evident from United's list of the following factors as justification to deny payment:

- Your child is medically stable.
- Your child is not at risk of severe withdrawals
- Your child is not having thoughts of harming himself or others.
- Your child does not hear things or see things that others don't

- Your child does not have severe mental health issues that keep your child from having treatment in a less intensive setting.
- Your child has family support.

61. C.W. pointed out that not one of these six factors were listed in United's residential treatment criteria as requirements for care to be approved.

62. He argued that requirements like hallucinations or thoughts of harm to self or others were acute level requirements and could not be applied to residential treatment without violating generally accepted standards of medical practice.

63. He noted that one of the bulleted points, "Your child is not at risk of severe withdrawals" was not even applicable to A.W.'s treatment as he did not have a substance abuse problem.

64. C.W. argued that while United had given the appearance that it had changed its guidelines following its loss in *Wit*, it clandestinely continued to rely on undisclosed and improper medical necessity criteria as a basis to deny coverage for residential treatment.

65. He stated that this was evident through United's repeated statements that A.W.'s treatment had been denied due to a failure to meet acute factors. C.W. asked United to comply with the Plan's definition of medical necessity and the court's findings in *Wit*.

66. He wrote that A.W.'s treatment was provided due to his history of regression and "escalating high-risk behaviors precluding lower levels of care from being safe or effective."

67. C.W. contended that United's denial violated MHPAEA through the imposition of treatment limitations. He wrote that according to MHPAEA, insurers were required to administer benefits for mental health facilities "at parity" with benefits for comparable medical or surgical facilities.

68. C.W. identified skilled nursing and inpatient rehabilitation facilities as some of the medical or surgical analogues to the treatment A.W. received.

69. C.W. argued that United did not impose acute level requirements on sub-acute medical or surgical care as it had done for A.W.'s residential treatment.

70. He stated that for United to impose acute care medical necessity criteria to sub-acute medical and surgical treatment would be akin to requiring an individual to actively be experiencing a heart attack before their skilled nursing treatment could be approved.

71. He contended that sub-acute facilities are "neither expected to treat, nor equipped to handle" individuals suffering from acute level symptoms.

72. C.W. pointed out that while United had a specific set of proprietary guidelines that individuals were required to meet in order for their residential treatment care to be approved, they did not appear to have any such guidelines for skilled nursing and inpatient rehabilitation care.

73. He wrote that having a set of guidelines which applied only to residential treatment centers while having no such guidelines for comparable medical or surgical care was another way in which United artificially restricted the availability of residential treatment care in violation of MHPAEA.

74. C.W. requested that United perform a parity analysis of the Plan to determine whether it was compliant with MHPAEA and asked to be provided with a copy of all documentation used and the results of this analysis.

75. C.W. argued that A.W.'s treatment was medically necessary and included letters of medical necessity with the appeal.

76. Debra Finn, M.A. wrote in part in a September 2019 letter:

Given the persistence of [A.W.]'s excessive and overriding anxiety over the years, and with increasing severity and escalation to disengagement from school, social interaction, life, and despite continued outpatient therapy and medication monitoring, a more intense level of treatment became necessary. A residential level of care would be necessary to achieve significant and lasting improvement of [A.W.]'s condition(s).

77. Lana Farina, Psy.D, wrote in part in a letter dated September 17, 2019:

Given [A.W.]'s lack of progress with outpatient therapy, medication management, and a therapeutic day school setting, we recommended a higher level of care. In fact, not only did we see a lack of progress, but [A.W.]'s conditioned [sic] actually worsened as he was so impaired that he could not regularly access or utilize these services. Given his persistent and severe anxiety and school refusal, coupled with depression, we recommended a higher level of care to support him clinically and academically. We recommended placement in a program that could provide continuous support such as a Wilderness Program and Residential Treatment Center.

78. Nora-Lynn San Diego, MD, wrote in part in a letter dated September 18, 2019:

[A.W.] has been to several different psychologists and psychiatrists in an outpatient setting, has been tried on multiple medications with varying degrees of success, and has been unable to maintain adequate attendance at 3 different schools, despite multiple provisions of support at school, at home and in outpatient treatment. While his parents have worked diligently to provide [A.W.] with a loving home and reputable educational programming and therapeutic services, [A.W.] continues to demonstrate a refusal to attend school and to engage in therapy or any medication trials for depression and anxiety. I strongly recommend that [A.W.] be placed in a therapeutic residential setting that can provide the resources and the structured setting that [A.W.] needs to address his academic and emotional needs.

79. Tara Stireman, LCSW, wrote in part in a letter dated September 24, 2019:

I have read the Insurance's reasons for denying [A.W.]'s coverage for WayPoint Academy and do not agree that [A.W.] can be successfully treated in a less intensive setting. While [A.W.] has made progress in treatment goals and, in residential care, is starting to live a life with some level of appropriate functioning, all previous lesser levels of care have been unsuccessful and unhelpful. [A.W.]'s severe mental health issues keep him from participating and being successful in less intensive treatment settings. He needs to continue to develop emotional and behavioral self-regulation, emotional functioning, insight and improved interpersonal relationships within a residential treatment setting. WayPoint Academy concurrently addresses his academic and emotional needs

while including a family component. It seems logical to continue care and coverage in an environment that is clearly helpful and effective.

80. C.W. pointed out that a number of different medical professionals that had treated A.W.

in person recommended that he receive residential treatment and asked on what basis

United disagreed with the providers who had treated him on a first-hand basis.

81. C.W. again asked for a copy of the Plan Documents.

82. In a letter dated March 27, 2020, United upheld the denial of payment for A.W.'s

treatment. The letter gave the following justification for the denial:

> After reviewing the appeal documents, your request for Mental Health Residential reimbursement at Way Point Academy, the Optum Level of Care Guideline for the Mental Health Residential Treatment Center Level of Care and Common Criteria and Clinical Best Practices for all levels of care, and your behavioral health plan benefits, it is my determination that no authorization can be provided from Date(s) of Service 8/29/19 forward.
>
> Your son had just successfully completed a 64 day outdoor Wilderness Program, during which time he was able to maintain his safety and functioning in an outdoor environment, engage with staff and peers, resolve conflicts by talking things out, and manage his impulses. He was eating and sleeping and doing his daily activities appropriately. He had learned and demonstrated use of coping skills for his worry, mood, behavior and continued socialization.
>
> From date of admission to Way Point Academy 08/22/2019 and forward, his mood, worries and behavior appeared to be sufficiently stable, to the extent that 24/7 monitoring in a supervised setting did not appear to be medically necessary and appropriate. There was minimal evidence of impairment of behavior or cognition that interfered with his activities of daily living to the extent his welfare or others was endangered. There were minimal psychosocial or environmental problems that would threaten his safety or undermine, at that point, his treatment in a less restrictive setting. He was noted to be generally calm and cooperative, responsive to staff, and doing reasonably well. There were no behavioral management challenges requiring 24 hour care and supervision. He had no suicidal or self harm thinking; no self injurious behaviors were reported. He posed no risk of harm to others – he was not threatening, or aggressive. He was thinking clearly and had no bizarre beliefs. His mood was noted to be mildly depressed and anxious. He was motivated and willing to engage. His remaining Mental Health symptom [sic] did not appear to seriously impact his ability to understand and participate in treatment programming. He was eating, sleeping and independently doing his daily activities. He had no medical or substance related issues. His

> parents were supportive and involved. There were no clinical barriers – following the 64 day Wilderness Program-preventing [sic] him from transitioning to a less intensive level of care. He did not need the frequent reassessment, frequent change of treatment plan, and daily 24 hour interaction with staff of a Residential Treatment Center. His overall care could have continued at that point in a Partial Hospitalization or Intensive Outpatient setting, preferably near home, with continued individual therapy, family work and his previously intact IEP. This would have helped to monitor and maintain his stability, continue to increase his functioning, develop a support system and further strengthen key relationships with friends and treatment professionals, while integrating him back into family and community life.

83. In a letter dated May 1, 2020, United reiterated that the denial had been upheld on March 26, 2020, but offered no further details. The letter stated in pertinent part:

> Based on a review of your request, you are requesting to review a 1st level appeal that was delivered on 02/21/2020. This appeal request has been received and reviewed with a decision to *uphold* made on 03/26/2020. Please contact Optum at the below number if you have further questions. (emphasis in original)

84. On May 19, 2020, C.W. submitted a level two appeal of the denial of payment of A.W.'s treatment.

85. C.W. argued that United had not complied with its obligations under ERISA and that he was "disturbed by the lack of transparency in United's review process." He wrote that United had not complied with his request for the Plan Documents, nor had it conducted a MHPAEA analysis as he had requested.

86. He asked how he could have any confidence that United was administering the Plan properly and complying with federal statutes when it refused to provide him with this documentation.

87. C.W. noted that United had disregarded his contention that its proprietary criteria continued to violate the *Wit* decision. He again questioned how he could have received a fair review when the criteria used was fundamentally flawed.

88. He stated that United had not given him the information he needed to perfect the claim and it had not meaningfully addressed the arguments he had raised. C.W. again requested a copy of the Plan Documents and again asked if United was not in possession of these documents or was not acting on behalf of the Plan Administrator in this regard that it forward his request to the appropriate entity.

89. On September 10, 2020, C.W. submitted a complaint against United to the Plan Administrator because it had failed to process his appeal within the timeframe outlined by the insurance policy.

90. This investigation ultimately revealed that United had failed to respond as it had for some reason not considered the request to be an appeal but instead a request for ERISA documents.

91. The letter reporting on the investigation stated that United would process the appeal but it did not elaborate on why, if United considered the appeal as a request for documents, no such documents were provided.

92. In a letter dated October 29, 2020, United upheld the denial of payment for A.W.'s treatment at Waypoint. The letter gave the following justification for the denial:

> **Your child was being treated for problems with his mood and behaviors. Your request was reviewed by a doctor. Your child was not taking any medications and had issues with mild depression and anxiety. He had completed a wilderness therapy program without any safety or behavioral problems. He was cooperative and participating in all aspects of treatment. He was attending classes. His symptoms were improved. We have denied the medical services requested after reviewing your letter of appeal and child's medical records and clinical notes.**
>
> **The criteria were not met because:**
> - **Your child did not need the care provided in RESIDENTIAL TREATMENT CENTER setting.**
> - **Your child could have been treated in a less intensive Level of Care.**

**In your case:**
- **Your child had no unsafe behaviors and was medically stable.**
- **Your child was cooperative and participating in treatment.**
- **Your child was able to learn and use coping skills and doing better.**
- **Your child was less depressed and less anxious.**
- **Your child was following rules and directions.**
- **Your child did not have clinical issues requiring 24 hour monitoring in a residential setting.**
- **Your child had no mental health issues that prevented treatment in a less intensive setting.**
- **Your child had a safe place to live and the support of family.**

**Care and recovery could have continued in the Mental Health PARTIAL HOSPITALIZATION PROGRAM (PHP) setting. Children and adolescents usually live at home during PHP.**
**Please discuss these options with your provider.**

**The Guideline/Policy/Criteria used for the decision is: The Optum Level of Care Guidelines for the Mental Health Residential Treatment Center level of care and the Common Criteria and Clinical Best Practices for All Levels of Care.** (emphasis in original)

93. The Plaintiffs exhausted their pre-litigation appeal obligations under the terms of the Plan and ERISA.

94. The denial of benefits for A.W.'s treatment was a breach of contract and caused C.W. to incur medical expenses that should have been paid by the Plan in an amount totaling over $270,000.

95. Except when it provided a copy of the case notes in one response to C.W.'s appeals, United failed to produce a copy of the Plan Documents including any medical necessity criteria for mental health and substance use disorder treatment and for skilled nursing or rehabilitation facilities, nor did it perform a MHPAEA compliance analysis in spite of C.W.'s repeated requests.

//

//

## FIRST CAUSE OF ACTION

### (Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))

96. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators.

97. It sets forth a special standard of care upon plan fiduciaries such as United, acting as agent of the Plan, to discharge its duties in respect to claims processing solely in the interests of the participants and beneficiaries of the Plan. 29 U.S.C. §1104(a)(1).

98. United and the Plan failed to provide coverage for A.W.'s treatment in violation of the express terms of the Plan, which promise benefits to employees and their dependents for medically necessary treatment of mental health and substance use disorders.

99. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with the Plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

100. The denial letters produced by United do little to elucidate whether United conducted a meaningful analysis of the Plaintiffs' appeals or whether it provided them with the "full and fair review" to which they are entitled.

101. United failed to substantively respond to the issues presented in C.W.'s appeals and did not meaningfully address the arguments or concerns that the Plaintiffs raised during the appeals process.

102. United and the agents of the Plan breached their fiduciary duties to A.W. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in A.W.'s interest and for the exclusive purpose of providing benefits to

ERISA participants and beneficiaries, to produce copies of relevant documents and information to claimants upon request, and to provide a full and fair review of A.W.'s claims.

103.     The actions of United and the Plan in failing to provide coverage for A.W.'s medically necessary treatment are a violation of the terms of the Plan and its medical necessity criteria.

## SECOND CAUSE OF ACTION

### (Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))

104.     MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA. The obligation to comply with both ERISA and MHPAEA is part of United's fiduciary duties.

105.     Generally speaking, MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

106.     MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and also makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

107.     Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity; refusal to pay for higher-cost treatment until it can be shown that a lower-cost treatment is not effective; and restrictions based on geographic location,

facility type, provider specialty, or other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A), (F), and (H).

108.    C.W. specifically listed facility type and geographic location as the primary factors involved in the denial of A.W.'s wilderness care. He argued that if the same care were not rendered in a wilderness setting it would have been approved.

109.    The medical necessity criteria used by United for the intermediate level mental health treatment benefits at issue in this case are more stringent or restrictive than the medical necessity criteria the Plan applies to analogous intermediate levels of medical or surgical benefits.

110.    Another example C.W. offered of United's violation of MHPAEA was in imposing stricter requirements on A.W.'s transportation to a mental health facility than it placed on comparable medical or surgical transportation.

111.    Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for A.W.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities.

112.    For none of these types of treatment does United exclude or restrict coverage of medical/surgical conditions by imposing restrictions such as an acute care requirement for a sub-acute level of care. To do so, would violate not only the terms of the insurance contract, but also generally accepted standards of medical practice.

113.     When United and the Plan receive claims for intermediate level treatment of

medical and surgical conditions, they provide benefits and pay the claims as outlined in

the terms of the Plan based on generally accepted standards of medical practice.

114.     United and the Plan evaluated A.W.'s mental health claims using medical

necessity criteria that deviate from generally accepted standards of medical practice. This

process resulted in a disparity because the Plan denied coverage for mental health

benefits when the analogous levels of medical or surgical benefits would have been paid.

115.     As an example of disparate application of medical necessity criteria between

medical/surgical and mental health treatment, United's reviewers improperly utilized

acute medical necessity criteria to evaluate the non-acute treatment that A.W. received.

116.     United's improper use of acute inpatient medical necessity criteria is revealed in

the statements in United's denial letters such as "He had no suicidal or self harm

thinking."

117.     This improper use of acute inpatient criteria was a nonquantitative treatment

limitation that cannot permissibly be applied to evaluate the sub-acute level of care that

A.W. received.

118.     The Plan does not require individuals receiving treatment at sub-acute inpatient

facilities for medical/surgical conditions to satisfy acute medical necessity criteria in

order to receive Plan benefits.

119.     The treatment provided in an acute care environment is necessarily distinct from

treatment provided in a non-acute environment.

120.     Utilizing acute criteria to evaluate a non-acute claim will result in a near universal denial of benefits, regardless of the medical necessity, clinical appropriateness, or nature of the treatment.

121.     C.W. pointed out that the use of acute level criteria was problematic in particular because following its loss in *Wit* United claimed to have rewritten its criteria to remove factors such as an acute level requirement which the *Wit* court had specifically identified as problematic. C.W. contended however that United continued to impose acute level requirements even though it could no longer point to any such requirements in its criteria.

122.     C.W. alleged that United's actions were a deliberate bad-faith attempt on its part to restrict the availability of residential treatment and minimize the costs for which it was responsible.

123.     Another example of the disparate treatment between intermediate level mental health and medical care is evident from the fact that United partially denied A.W.'s treatment on the basis that he had received previous treatment in a wilderness setting.

124.     In the medical or surgical realm, United does not deny payment due to treatment previously provided to a patient. While it may at times take prior history into account in order to paint a more complete picture of the patient's profile, it assesses the medical necessity of each treatment intervention on the merits and does not automatically deny payment based on a previous history.

125.     Along this same vein, United relied on factors such as "**Your child was not taking any medications**" (emphasis in original) as a justification to deny care.

126.    Again, while the denial letters list such factors as justifications to deny care, United does not deny payment for medical or surgical treatment simply because an individual is not taking medications.

127.    C.W. identified yet another example of United's violation of MHPAEA in its requirement that its insureds receiving residential treatment care satisfy a set of conditions listed only in proprietary guidelines.

128.    C.W. stated his belief that no such guidelines existed for skilled nursing and other intermediate level medical or surgical services.

129.    He asked United to provide him with any such guidelines if they existed, but as with his other requests for documents United refused to comply or even forward the request to the Plan Administrator as C.W. asked.

130.    In this manner, the Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and United, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

131.    United and the Plan did not produce the documents the Plaintiffs requested to evaluate medical necessity and MHPAEA compliance, nor did they address in any substantive capacity the Plaintiffs' allegations that United and the Plan were not in compliance with MHPAEA.

132.    The violations of MHPAEA by United and the Plan are breaches of fiduciary duty

and also give the Plaintiffs the right to obtain appropriate equitable remedies as provided

under 29 U.S.C. §1132(a)(3) including, but not limited to:

(a) A declaration that the actions of the Defendants violate MHPAEA;

(b) An injunction ordering the Defendants to cease violating MHPAEA and requiring

   compliance with the statute;

(c) An order requiring the reformation of the terms of the Plan and the medical necessity

   criteria utilized by the Defendants to interpret and apply the terms of the Plan to

   ensure compliance with MHPAEA;

(d) An order requiring disgorgement of funds obtained by or retained by the Defendants

   as a result of their violations of MHPAEA;

(e) An order requiring an accounting by the Defendants of the funds wrongly withheld by

   each Defendant from participants and beneficiaries of the Plan as a result of the

   Defendants' violations of MHPAEA;

(f) An order based on the equitable remedy of surcharge requiring the Defendants to

   provide payment to the Plaintiffs as make-whole relief for their loss;

(g) An order equitably estopping the Defendants from denying the Plaintiffs' claims in

   violation of MHPAEA; and

(h) An order providing restitution from the Defendants to the Plaintiffs for their loss

   arising out of the Defendants' violation of MHPAEA.

133.    In addition, Plaintiffs are entitled to an award of prejudgment interest pursuant to

U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g).

WHEREFORE, the Plaintiffs seek relief as follows:

1.  Judgment in the total amount that is owed for A.W.'s medically necessary treatment at Elements and Waypoint under the terms of the Plan, A.W.'s transportation costs to Elements via Assisted Interventions, plus pre and post-judgment interest to the date of payment;

2.  Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiffs' Second Cause of Action;

3.  Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

4.  For such further relief as the Court deems just and proper.

DATED this 29th day of October, 2021.

By ____s/ Brian S. King_____
Brian S. King
Attorney for Plaintiffs

County of Plaintiffs' Residence:
Bronx County, New York.